# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| DOMINIQUE WATSON,<br><br>            Plaintiff,<br><br>      v.<br><br>DISTRICT OF COLUMBIA *et al.*,<br><br>            Defendants. | Civil Action No. 23-1670 (BAH)<br><br>Judge Beryl A. Howell |

## <u>MEMORANDUM OPINION</u>

Plaintiff Dominique Watson, in her individual capacity and as the putative personal representative of the Estate of Giovanni Love ("decedent"), brought this action against the District of Columbia and the District's Department of Corrections ("DOC") Director Thomas Faust (jointly, "defendants") in connection with decedent's death by suicide while incarcerated at the Central Detention Facility ("CDF").[1]  Specifically, plaintiff asserts claims of deliberate indifference, in violation of the Fifth Amendment, pursuant to 42 U.S.C. § 1983; failure to accommodate, in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and Rehabilitation Act, 29 U.S.C. § 701 *et seq.*; common law negligence; and wrongful death, in violation of D.C.'s Wrongful Death Statute, D.C. Code § 16-2701 *et seq.  See generally* Compl., ECF No. 1.

---

[1]       "Officer Akaie" and Unity Healthcare, Inc. ("Unity") were also named as defendants, but plaintiff's claims as to them have been dismissed.  Plaintiff was granted a 30-day extension, until October 12, 2023, to serve "Officer Akaie," *see* Min. Order (Sept. 12, 2023), but plaintiff, over nine months later, still has not served him.  The claims against "Officer Akaie" are thus dismissed without prejudice, pursuant to Federal Rule of Civil Procedure 4(m).  In addition, after the United States substituted itself as a defendant, pursuant to the Federally Supported Health Centers Assistance Act, 42 U.S.C. § 233, for the claims brought against Unity in this action, *see* Notice of Substitution of United States, ECF No. 38, plaintiff and the United States stipulated to dismissal of these claims, *see* Stipulation of Dismissal, ECF No. 44; Min. Order (Feb. 9, 2024) (dismissing claims against the United States without prejudice).  Three months later, defendants filed a Third-Party Complaint against Unity, seeking contribution and indemnification from Unity if defendants are found liable, *see* 3d Party Compl., ECF No. 46, but the allegations in the Third-Party Complaint are not at issue at this stage of the proceedings.

Defendants have moved for partial dismissal of the Complaint, pursuant to Federal Rule of Civil Procedure 12(b)(6).  *See* Defs.' Partial Mot. to Dismiss ("Defs.' Mot."), ECF No. 20; *see also* Pl.'s Opp'n Defs.' Partial Mot. to Dismiss ("Pl.'s Opp'n"), ECF No. 28; Defs.' Reply Supp. Partial Mot. to Dismiss ("Defs.' Reply"), ECF No. 30.  For the reasons set forth below, the motion is **GRANTED IN PART AND DENIED IN PART**.

## I.     BACKGROUND

Decedent, who "gr[ew] up as a ward of the state," suffered from mental illness, having been diagnosed with "a depressive or mood disorder that placed him at risk for manic conduct, anxiety, depression, impulsive actions, self-harm, suicidal ideations, and suicide."  Compl. ¶ 13.  He had a history of self-harm, including "acts of self mutilation that left scars on his body," had expressed suicidal ideations "on multiple occasions," and had previously "attempted suicide by hanging himself."  *Id.* ¶¶ 15–16.

As alleged in the Complaint, CDF and Unity staff were aware of decedent's history of mental illness and high risk of suicide for several reasons.[2]  First, decedent had engaged in self-harm and attempted suicide while previously detained at CDF.  *Id.* ¶ 17; *see also id.* ¶ 18 ("[I]t was during his incarcerations that he had primarily engaged in self-harm and suicidal behavior.").  Second, in March and April 2022, during one of decedent's periods of detention, CDF issued an electronic warning that decedent was "suicidal" in its "computerized inmate information system," which system was "widely accessible to [CDF] personnel" and "would have been accessed by anyone at [CDF] making placement decisions, classification decisions, overseeing detainee medical and mental healthcare, and any person responsible for protecting [CDF] detainees against self-harm."  *Id.* ¶¶ 19–20.  Third, during decedent's "several prior

---

[2]     Unity is "an outside vendor contracted by the District to provide medical health care services to inmates in [DOC] facilities."  Compl. ¶ 7.

incarcerations," CDF and Unity staff had "prescribed and/or administered multiple antipsychotic drugs" to him, "specifically to address his mental illness and the risk that he would harm himself or commit suicide." *Id.* ¶ 21.

On May 27, 2022, decedent was again arrested and detained at CDF, *id.* ¶ 22, but despite his known history of mental illness and suicide attempts, CDF and Unity staff placed him in neither "a cell that would permit careful and constant monitoring," nor "a cell that would help prevent him from engaging in suicidal and self-harm conduct he had undertaken in the past," *id.* ¶¶ 23–24.  Instead, decedent was placed in "a general population cell, with access to implements with which he could harm himself, including bedsheets," *id.* ¶ 25, and that implemented "standard, 30-minute monitoring of cells," which "allows ample time [for detainees] to fashion a means of self-harm or suicide, and permits enough time for a suicide attempt to be completed before staff are able to recognize the suicide attempt and intervene," *id.* ¶¶ 33–34.

While incarcerated, decedent was "significantly agitated and spoke about killing himself." *Id.* ¶ 26.  Although he initially had a cellmate, who "kept him company and was able to intervene and prevent [him] from engaging in acts of self-harm," decedent was eventually reassigned to a single cell. *Id.* ¶¶ 27–28.  Alone, he "deteriorated," "engage[d] in acts of self-harm," such as cutting himself, and "became despondent." *Id.* ¶¶ 29–30.  By June 6, 2022, he had written a suicide note to his wife. *Id.* ¶ 30.  Decedent told CDF and Unity staff that he was suicidal but received no help. *Id.* ¶ 31.  In fact, one correctional officer, "Officer Akaie," allegedly encouraged decedent to kill himself, and "did nothing to mitigate the effect of this comment thereafter." *Id.* ¶ 32.

On June 9, 2022, the officer assigned to perform regular 30-minute cell checks of decedent's cell allegedly failed to do so, "ignor[ing] their rounds" in favor of "socializ[ing] with

one another." *Id.* ¶ 35.  That same day, decedent, alone in his cell, fashioned a noose out of a bedsheet and hung himself. *Id.* ¶ 36.  He was pronounced dead at the scene. *Id.*

One year later, on June 8, 2023, plaintiff brought this five-count action against, *inter alia*, the District and Director Faust, asserting federal claims of deliberate indifference in failing to train, in violation of the Fifth Amendment, pursuant to 42 U.S.C. § 1983, and failure to accommodate, in violation of the ADA and Rehabilitation Act, as well as state law claims of negligence and wrongful death.  Defendants have moved for partial dismissal of the claims against them, which motion is now ripe for consideration.

## II.   LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, the "complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).  A claim is facially plausible when the plaintiff pleads facts that are more than "merely consistent with a defendant's liability" and that "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citation omitted); *see also Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015) ("Plausibility requires more than a sheer possibility that a defendant has acted unlawfully." (citation omitted)).  "[A] complaint survives a motion to dismiss even if there are two alternative explanations, one advanced by the defendant and the other advanced by the plaintiff, both of which are plausible." *VoteVets Action Fund v. U.S. Dep't of Veterans Affs.*, 992 F.3d 1097, 1104 (D.C. Cir. 2021) (alterations in original accepted and citation omitted).

In deciding a motion under Rule 12(b)(6), a court must consider the whole complaint, accepting all factual allegations in the complaint as true, "even if doubtful in fact," and construing all reasonable inferences in the plaintiff's favor. *Bell Atl. Corp. v. Twombly*, 550 U.S.

544, 555 (2007); *see also Atchley v. AstraZeneca UK Ltd.*, 22 F.4th 204, 210 (D.C. Cir. 2022).  A

court, however, does not "accept inferences drawn by a plaintiff if such inferences are

unsupported by the facts set out in the complaint." *Nurriddin v. Bolden*, 818 F.3d 751, 756 (D.C.

Cir. 2016) (alterations in original accepted and citation omitted); *see also Iqbal*, 556 U.S. at 679

("While legal conclusions can provide the framework of a complaint, they must be supported by

factual allegations.").  In determining whether a complaint fails to state a claim, a court may

consider only the facts alleged in the complaint and "any documents either attached to or

incorporated in the complaint and matters of which the court may take judicial notice." *N. Am.*

*Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1249 (D.C. Cir. 2020) (alterations in original accepted

and citation omitted); *see also Valambhia v. United Republic of Tanzania*, 964 F.3d 1135, 1137

(D.C. Cir. 2020) (explaining that a court may consider, on a motion to dismiss, documents

attached to a defendant's motion that are referred to in the complaint and are integral to the

plaintiff's claim, "to the extent the plaintiff[] intend[s] incorporation").[3]

## III.    DISCUSSION

Plaintiff asserts, against the District and Director Faust, federal claims of deliberate

indifference in failing to train, in violation of the Fifth Amendment, pursuant to 42 U.S.C.

§ 1983, *see* Compl. ¶¶ 37–46 (Count I); and failure to accommodate, in violation of the ADA,

*see id.* ¶¶ 47–59 (Count II), and Rehabilitation Act, *see id.* ¶¶ 60–64 (Count III); as well as state

law claims of negligence (Count IV), *see id.* ¶¶ 65–72; and wrongful death, *see id.* ¶¶ 73–75

---

[3]     For this reason, the following documents, which are attached to defendants' motion and are referenced as
central to plaintiff's claims in the Complaint, are incorporated by reference and may be considered: (1) the
September 2013 report by Lindsay Hayes on Suicide Prevention Practices within the D.C. Department of
Corrections Central Detention Facility, *see* Defs.' Partial Mot. to Dismiss, Ex. A ("Hayes Rep."), ECF No. 20-1;
(2) the June 2015 report by the Washington Lawyers' Committee for Civil Rights and Urban Affairs, *see* Defs.'
Partial Mot. to Dismiss, Ex. B ("WLC Rep."), ECF No. 20-2; and (3) the 2021 inspection by the U.S. Marshals
Service, *see* Defs.' Partial Mot. to Dismiss, Ex. C ("USMS Rep."), ECF No. 20-3.  *See* Compl. ¶¶ 39–42; *see also*
Defs.' Mot. at 8–14; Pl.'s Opp'n at 5–8.

(Count V).  Defendants have moved to dismiss the federal claims, in Counts I, II and III, against

them and the state law claims, in Counts IV and V, against only Director Faust, but not the state

law claims against the District.  For the reasons set forth below, the claims against Director Faust

are dismissed, but defendants' motion to dismiss the federal claims against the District is denied.

### A.      Deliberate Indifference (Count I)

Section 1983 provides a remedy for an individual who has been deprived, by a person

acting under color of state law, of "any rights, privileges, or immunities secured by the

Constitution and laws" of the United States.  42 U.S.C. § 1983.  Although the contours of

plaintiff's § 1983 claim are murky as alleged in the Complaint, plaintiff clarifies in opposition

that Count I "alleges that the District's failure to train its employees in the proper detection,

treatment, and monitoring of potentially suicidal detainees amounts to deliberate indifference to

the rights of detainees like [decedent]," in violation of the Fifth Amendment.  Pl.'s Opp'n at 5.

In support of this allegation, plaintiff relies on the factual circumstances surrounding

decedent's death, as well as three reports that allegedly show that defendants "do a poor job of

treating detainees humanely in general, and of protecting against suicide in particular": (1) a

September 2013 report by Lindsay Hayes on Suicide Prevention Practices within the D.C.

Department of Corrections Central Detention Facility ("Hayes Report"); (2) a June 2015 report

by the Washington Lawyers' Committee for Civil Rights and Urban Affairs ("WLC Report");

and (3) a 2021 inspection by the U.S. Marshals Service ("Marshal Report").  *See* Compl. ¶¶ 39–

42.  Plaintiff's *Monell* claim against the District and supervisory claim against Director Faust

will be addressed *seriatim*.

1.      *The District of Columbia*

a)      *Legal Standard*

The term "person" in § 1983 includes municipalities and other local government units, such as the District.  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91 (1978).  A municipality, however, "cannot be held liable *solely* because it employs a tortfeasor," that is, on a *respondeat superior* theory.  *Id.*  Rather, to state a *Monell* claim under § 1983, a plaintiff must allege a constitutional violation caused by "the municipality's custom or policy."  *Warren v. District of Columbia*, 353 F.3d 36, 38 (D.C. Cir. 2004); *see also Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003) (explaining that a plaintiff must allege that a custom or policy was the "'moving force' behind [a] constitutional violation" (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389 (1989))); *Connick v. Thompson*, 563 U.S. 51, 60 (2011) ("[U]nder § 1983, local governments are responsible only for their *own* illegal acts." (citation omitted)).

"In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983," but "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train."  *Connick*, 563 U.S. at 61.  "[A] municipality's failure to train its employees in a relevant respect must amount to 'deliberate indifference to the rights of persons with whom the untrained employees come into contact.'  Only then 'can such a shortcoming be properly thought of as a city policy or custom that is actionable under § 1983.'"  *Id.* (quoting *Canton*, 489 U.S. at 388–89); *see also Daskalea v. District of Columbia*, 227 F.3d 433, 441 (D.C. Cir. 2000) ("[A] city's inaction, including its failure to train or supervise its employees adequately, constitutes a policy or custom under

*Monell* when it can be said that the failure amounts to deliberate indifference towards the constitutional rights of persons in its domain." (citation omitted)).

"[D]eliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick*, 563 U.S. at 61 (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 410 (1997)). Only when "policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights" and nonetheless "choose to retain that program" may a municipality "be deemed deliberately indifferent." *Id.*; *see also Canton*, 489 U.S. at 392 (explaining that to state a municipal failure-to-train claim, plaintiff must show that "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymaker of the city can reasonably be said to have been deliberately indifferent to the need"); *Hurd v. District of Columbia*, 997 F.3d 332, 339 (D.C. Cir. 2021) ("[W]hen faced with actual or constructive knowledge that its agents will probably violate constitutional rights, the city may not adopt a policy of inaction." (alteration in original accepted and citation omitted)). "A less stringent standard of fault for a failure-to-train claim 'would result in *de facto respondeat superior* liability on municipalities.'" *Connick*, 563 U.S. at 62 (quoting *Canton*, 489 U.S. at 392). While proving failure to train is "no easy task," *Atchinson v. District of Columbia*, 73 F.3d 418, 421 (D.C. Cir. 1996), "[t]here is no different, higher pleading standard for alleging a failure to train claim," *Waldo v. District of Columbia*, No. 19-cv-136 (TSC), 2021 WL 4502049, at *2 (D.D.C. Oct. 1, 2021).

The most common way to establish deliberate indifference for purposes of failure to train is to allege "[a] pattern of similar constitutional violations by untrained employees." *Connick*,

563 U.S. at 62.  "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights."  *Id.*

"[I]n a narrow range of circumstances," however, "a pattern of similar violations might not be necessary," *id.* at 63 (quoting *Bryan Cnty.*, 520 U.S. at 409), and a single incident of unconstitutional activity may be sufficient, with "proof that the activity was caused by a municipal policy," *Atchinson*, 73 F.3d at 421; *see also id.* at 423 ("A complaint describing a single instance of official misconduct and alleging a failure to train may put a municipality on notice of the nature and basis of a plaintiff's claim."); *Page v. Mancuso*, 999 F. Supp. 2d 269, 282 (D.D.C. 2013) (Brown Jackson, J.) ("Failure to train liability usually requires showing a pattern of similar constitutional violations, but on rare occasions, a single unconstitutional incident may be sufficient to show deliberate indifference.").  In these cases, "[l]iability can be drawn from a single incident if there is at least an 'affirmative link' between an allegedly unconstitutional policy and that incident."  *Waldo*, 2021 WL 4502049, at *4 (quoting *Okla. City v. Tuttle*, 471 U.S. 808, 823 (1985)); *see also Connick*, 563 U.S. at 63 (explaining that, sometimes, "the unconstitutional consequences of failing to train [are] so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations").

> b)   *Applied Here*

The parties appear to agree that plaintiff has alleged a constitutional harm, *see Baker*, 326 F.3d at 1306 (explaining that a plaintiff need only allege that "there is some constitutional harm suffered by the plaintiff, not whether the municipality is liable for that harm"), and dispute only whether plaintiff has alleged that a District policy was the moving force behind the alleged harm. Relying on both theories of deliberate indifference, "[p]laintiff alleges that the District's failure

to train its employees in the proper detection, treatment, and monitoring of potentially suicidal detainees amounts to deliberate indifference to the rights of detainees like [decedent]." Pl.'s Opp'n at 5. Specifically, plaintiff alleges that the District "provid[ed] inadequate and irrelevant training to its employees and clinicians that fell below the applicable national standards," resulting in "a custom of performing hollow inmate medical evaluations that were comprised of cursory, incomplete, or meaningless questions that lead to flawed data and avoidable failures to diagnose and treat seriously ill and obviously afflicted inmates," and a "widespread lack of monitoring of suicidal detainees." Compl. ¶ 40.

Plaintiff contends that the single incident involving decedent, with plaintiff's "assertion that the District's failure to train its officers showed deliberate indifference," is sufficient, at the motion to dismiss stage, to state a claim under *Monell*. Pl.'s Opp'n at 5. Plaintiff is correct given the contextual allegations here. As alleged in the Complaint, CDF personnel knew of decedent's history of "mental illness and high risk for suicide" because, while previously incarcerated, decedent had "on multiple occasions" engaged in self-harm, "expressed suicidal ideations," and even attempted to commit suicide and thus was "prescribed and/or administered multiple antipsychotic drugs." Compl. ¶¶ 16–17, 21. Indeed, CDF's "widely accessible" computerized inmate information system, which would have been accessed by CDF personnel "making placement decisions, classification decisions, [and] overseeing detainee medical and mental healthcare," "prominently displayed a warning that [decedent] was 'suicidal.'" *Id.* ¶¶ 19–20. Despite these warnings, CDF personnel allegedly placed decedent alone "in a general population cell, with access to implements with which he could harm himself," ignored his acts of self-harm and suicidal ideations, with one officer even encouraging decedent to kill himself, and failed adequately to check in on him. *Id.* ¶¶ 23–35. Plaintiff alleges that these practices

inadequately protected decedent, and other "detainees at risk of suicide," and are a result of defendants' "inadequate" training.  *Id.* ¶¶ 40, 43.

Accepting these allegations as true and drawing all reasonable inferences in plaintiff's favor—as the Court must at the motion to dismiss stage—plaintiff's allegations that CDF staff placed decedent alone in a general population cell that was monitored only every 30 minutes, instead of "a suicide-resistant cell," *id.* ¶ 33, and with tools with which defendant could commit suicide, despite their knowledge of decedent's high risk of suicide and his suicide note and acts of self-harm in the days before his death, "may reasonably suggest misconduct sufficiently serious and obvious to justify an *allegation* of improper training" in the proper detection, treatment, and monitoring of potentially suicidal detainees, *Atchinson*, 73 F.3d at 422; *see also Baker*, 326 F.3d at 1307 ("[I]f a complaint alleging municipal liability under § 1983 may be read in a way that can support a claim for relief, thereby giving the defendant fair notice of the claim, that is sufficient.").  Plaintiff, "of course, will need to *prove* more about the District's [suicide-prevention] training to prevail on the merits," *Atchinson*, 73 F.3d at 422, but the Complaint's allegations are sufficient at this early stage of the litigation, *see, e.g.*, *Powers-Bunce v. District of Columbia*, 479 F. Supp. 2d 146, 155–56 (D.D.C. 2007) (declining to dismiss a complaint that "generally recount[ed] the circumstances of [decedent's] suicide" and asserted that "the District's failure to train its police officers in the proper detection and treatment of potentially suicidal detainees amounts to deliberate indifference to the rights of detainees," even though the complaint did "not explain how the District's training policies were deficient" or "allege that the failure to supervise officers was systematic within the MPD such that it rose to the level of policy"); *Waldo*, 2021 WL 4502049, at *4 (concluding that plaintiff's allegations that MPD's training was "inadequate," "lacking any specialized mental health and/or suicide prevention

training," and thus caused "MPD personnel to miss [decedent's] clearly and persistently

exhibited signs of distress and signs of suicidal ideation, and place him in a cell where he was

able to take his own life," were sufficient, despite being only "a single tragic incident," to state a

claim of failure to train).

       Defendants curiously do not address—and thus do not contest—that municipal liability

can be established based on the single incident involving decedent, coupled with plaintiff's

allegations of failure to train.  *See McGinnis v. District of Columbia*, 65 F. Supp. 3d 203, 224

(D.D.C. 2014) (collecting cases stating that a court will deem, as abandoned, any arguments

defendants fail to address in their motion or reply).  They focus on only the Hayes, WLC, and

Marshal Reports, arguing that none of these reports support plaintiff's deliberate indifference

claim.  *See* Defs.' Mot. at 8–14; Defs.' Reply at 2–8.

       Defendants are correct that the Marshal Report, standing alone, is "too conclusory and

vague" to support a claim for deliberate indifference.  Defs.' Mot. at 9.  As alleged in the

Complaint, the Marshal Report described "widespread problems at the jail, including routinely

abusive and punitive behavior by jail guards towards detainees" and "reported indifference by

jail supervisors to the inappropriate conditions at the jail."  Compl. ¶ 42; *see also* Pl.'s Opp'n at 7

(summarizing the Marshal Report, with no reference to incarcerated individuals at risk of suicide

or defendants' training policies).  While serious, the allegations in the Marshal Report, even as

described by plaintiff, have no relevance to whether defendants were deliberately indifferent to

the needs of suicidal detainees and thus to plaintiff's failure to train claim.

       Defendants are incorrect, however, that the Hayes and WLC Reports prove that "DOC

officials were not deliberately indifferent to the Fifth Amendment rights of [CDF] inmates at risk

for suicide."  Defs.' Mot. at 18; *see also id.* at 9–12 (arguing that the reports affirmatively prove

that defendants were not deliberately indifferent).  Defendants overplay their hand by overstating

the conclusion of these two reports.  The Hayes Report found, with respect to training, that

(1) correctional officers that are "assigned to [CDF's] mental health unit . . . do *not* receive any

specialized mental health and/or suicide prevention training (either on a pre-service or annual

basis)"; (2) "the totality of suicide prevention training to *all* employees" is one hour of

instruction on "a 39-slide PowerPoint presentation entitled 'Suicide Prevention'"; and (3) "Unity

Health Care providers and qualified mental health professionals" receive an additional hour of

instruction on "a 44-slide PowerPoint presentation entitled 'Suicide Prevention and

Corrections,'" which presentation "is not clinically-focused and does not provide guidance on

the clinical assessment of suicide risk."  Hayes Rep. at 9–10.  Accordingly, the Hayes Report

concluded that "the number of hours devoted to both pre-service and annual suicide prevention

training for correctional, medical, and mental health staff is inadequate, and the content of the

training curricula is in need of improvement," and made a series of recommendations.  *Id.* at 10;

*see also* WLC Rep. at 22–23 (summarizing Hayes Report findings); *Waldo*, 2021 WL 4502049,

at *3 (acknowledging that this report, which "was commissioned by DOC's Director specifically

for implementation at [CDF]," "identified shortcomings in preventing suicides in inmates housed

in DOC facilities" (citation omitted)).  A year and a half later, the WLC Report commended

DOC for implementing "some improvements in the [DOC]'s suicide prevention program," such

as "[i]nstitut[ing] a more robust four-hour suicide prevention training curriculum."  WLC Rep. at

24.  It ultimately concluded, however, that "more work needed to be done" and "was unable to

verify" whether "the recommendations of the Hayes Report have been implemented."  *Id.* at 24–

25 (citation omitted); *see also id.* at 25 ("[N]one of these improvements make clear how

prisoners who were isolated for exhibiting suicidal behavior would be treated in a manner that is

less restrictive or punitive than before."); *id.* at 47 (explaining that "a number of steps are urgently needed to address deficiencies," including in "training"); *id.* at 49 (making additional recommendations "to ensure that adequate training is provided" and that "the right people are receiving the right training, and that the training they receive is sufficiently thorough and reflects modern correctional practices").

While a court need not accept as true any factual allegations in the complaint that are contradicted by documents incorporated in the complaint, *see Kaempe v. Myers*, 367 F.3d 958, 963 (D.C. Cir. 2004), plaintiff's pertinent allegations about defendants' failure to train are not obviously contradicted by the Hayes and WLC Reports. Rather, the parties' dispute amounts to quibbling over what the reports conclude, with each side cherry picking quotations from the reports to support their respective positions. Defendants may ultimately be right that plaintiff overstates some of the Hayes and WLC Reports' conclusions, *see* Defs.' Mot. at 9–12, but concluding as such, at the motion to dismiss stage, would be premature. In simple terms, plaintiff has alleged that defendants provided "inadequate" training to its employees and clinicians, were aware of these inadequacies, and have not yet fixed the problem. *See* Compl. ¶¶ 41–42. As explained above, these allegations, coupled with the facts regarding decedent's suicide, are sufficient to state a claim for deliberate indifference.

Defendants further argue, relying exclusively on *Moore v. District of Columbia*, 79 F. Supp. 3d 121 (D.D.C. 2015), and *Egudu v. District of Columbia*, 72 F. Supp. 3d 34 (D.D.C. 2014), that even if the Hayes and WLC Reports do not refute plaintiff's deliberate indifference claim, they are "too remote in time" to support plaintiff's claim, having been completed almost nine and seven years, respectively, prior to decedent's death. Defs.' Mot. at 12 (capitalization omitted). Again, defendants' argument is premature. In both *Moore* and *Egudu*, which involved

motions for summary judgment, rather than motions to dismiss, and thus benefited from discovery, the Court acknowledged that non-contemporaneous studies could support deliberate indifference claims if the record showed that the pattern of unconstitutional conduct continued to the present day.  *See Moore*, 79 F. Supp. 3d at 140; *Egudu*, 72 F. Supp. 3d at 43.  Here, plaintiff has alleged that defendants' failures, as described in the Hayes and WLC Reports, persist today. *See* Compl. ¶¶ 41–43; Pl.'s Opp'n at 8.  Such allegations are sufficient to survive defendants' motion to dismiss.

According, defendants' motion to dismiss Count I against the District is denied.

### 2. *Director Faust*

#### a) *Legal Standard*

In suits brought under Section 1983 against individuals, "[t]he doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).  The doctrine "gives government officials breathing room to make reasonable but mistaken judgments" and "protects all but the plainly incompetent or those who knowingly violate the law."  *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)).  In determining whether a government official should be entitled to qualified immunity, the two pertinent questions are (1) "whether the facts that a plaintiff has alleged . . . make out a violation of a constitutional right," and (2) "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct."  *Pearson*, 555 U.S. at 232 (citation omitted).

To be "clearly established," a legal principle must be "settled law, which means it is dictated by controlling authority or a robust consensus of cases of persuasive authority."  *District*

*of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (citations omitted).  "It is not enough that the rule is suggested by then-existing precedent.  The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *Id.*  "Otherwise, the rule is not one that 'every reasonable official' would know."  *Id.*

A legal principle must also "clearly prohibit the officer's conduct in the particular circumstances before him," and its "contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted," which "requires a high degree of specificity."  *Id.* at 63 (citations omitted).  The Supreme Court has "repeatedly stressed that courts must not define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced."  *Id.* at 63–64 (citation omitted).  "While there does not have to be a case directly on point, existing precedent must place the lawfulness of the particular [conduct] beyond debate," and thus "a body of relevant case law is usually necessary to clearly establish the answer."  *Id.* at 64 (citations omitted).

> b)  *Applied Here*

At the outset, the Complaint is silent as to the capacity in which plaintiff is suing Director Faust.  In these circumstances, "the 'course of proceedings' will usually indicate the sort of liability the plaintiff seeks to impose."  *Atchinson*, 73 F.3d at 425 (quoting *Kentucky v. Graham*, 473 U.S. 159, 167 n.14 (1985)).  Plaintiff does not respond to defendants' argument that "any official capacity claim against Director Faust should be dismissed as redundant," Defs.' Mot. at 6 n.5, arguing only that Director Faust is not entitled to qualified immunity.  Accordingly, the Complaint is construed to allege, in Count I, a § 1983 claim against Director Faust in his

individual capacity for failure to train based on deliberate indifference.  *See Atchinson*, 73 F.3d at 425 (explaining that "qualified immunity . . . is available only in individual capacity suits").

Although the standard for supervisory liability and *Monell* liability are not identical, the parties appear to agree, at this stage of the proceedings, that whether plaintiff has alleged a constitutional violation against Director Faust and the District rise and fall together, given that Count I against the District and Director Faust are supported by the exact same factual allegations.  *See* Compl. ¶¶ 37–46; *see also* Defs.' Mot. at 18 (arguing that plaintiff has not alleged a constitutional violation against the District for the same reasons, "stated above," as with respect to Director Faust); Pl.'s Opp'n at 8 ("The District's policies, summarized above, are attributable to [Director] Faust.").  For the same reasons that plaintiff has alleged a *Monell* claim against the District, sufficient to survive a motion to dismiss, plaintiff has also adequately alleged a constitutional violation as to Director Faust.  The question remains, however, "whether the right at issue was clearly established at the time of defendant's alleged misconduct."  *Pearson*, 555 U.S. at 232 (citation omitted).

Plaintiff insists that "[a]n inmate's right to be free from deliberate indifference to a serious medical need," and that "an official may be liable for not preventing the suicide of a prisoner if the official was aware of a serious risk that the prisoner would commit suicide and failed to take reasonable steps to prevent it," are clearly established.  Pl.'s Opp'n at 10.  While undisputed, *see* Defs.' Reply at 8, these assertions are not relevant to the "clearly established" inquiry here, which "requires that the legal principle clearly prohibit the officer's conduct *in the particular circumstances before him*," *Wesby*, 583 at 63 (emphasis added).[4]  Here, plaintiff

---

[4]  "[T]here can be the rare obvious case, where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances," *Wesby*, 583 U.S. at 64 (citation omitted), but plaintiff does not contend that this is such a "rare obvious case."

alleges that "the District's failure to train its employees in the proper detection, treatment, and monitoring of potentially suicidal detainees amounts to deliberate indifference to the rights of detainees," Pl.'s Opp'n at 5, and that "[t]he District's policies . . . are attributable to [Director] Faust," *id.* at 8.  To defeat Director Faust's assertion of qualified immunity, therefore, plaintiff bears the "high[]" burden of "point[ing] to existing precedent that places" "beyond debate" "the relevant constitution question" of whether the District's policies, which are allegedly attributable to Director Faust, rise to the level of failure to train, sufficient to state a claim of deliberate indifference.  *Bernier v. Allen*, 38 F.4th 1145, 1155 (D.C. Cir. 2022) (citation omitted).

"Whatever the right answer is to that question," the existing law does not make it clear. *Id.*  Plaintiff does not identify "any controlling precedent from the Supreme Court or [the D.C. Circuit]," much less precedent that "affirmatively identifies that right in a particularized sense so that its contours are clear to a reasonable official." *Id.* (alteration in original accepted and citation omitted).  Plaintiff also fails to establish "a consensus of cases of persuasive authority," *id.* (citation omitted), such that Director Faust could not have reasonably believed that CDF's policies and practices did not rise to the level of deliberate indifference, especially given that Director Faust, at least once, implemented improvements to CDF's training policies.  Although plaintiff cites a plethora of cases for the broad proposition that "an official may be liable for not preventing the suicide of a prisoner," Pl.'s Opp'n at 10, none of these cases involve § 1983 claims for deliberate indifference based on failure to train.[5]  Perhaps recognizing that these cases

---

[5]       None of the cases cited by plaintiff involve unconstitutional municipal policies that are allegedly attributable to a supervisor.  *See* Pl.'s Opp'n at 11–12.  Instead, all involve claims against officers who directly ignored a known and substantial risk that a detainee would commit suicide.  *See, e.g.*, *Troutman v. Louisville Metro Dep't of Corr.*, 979 F.3d 472, 484–87, 491 n.14 (6th Cir. 2020) (permitting a claim of deliberate difference to a serious medical need based on defendant placing an individual with suicidal tendencies in solitary confinement to proceed to trial, but dismissing a § 1983 claim alleging that failure to train amounted to deliberate indifference); *Hall v. Ryan*, 957 F.2d 402, 403 & n.2 (7th Cir. 1992) (permitting a claim of deliberate indifference based on willful neglect, but noting that plaintiff did not appeal the dismissal of plaintiff's § 1983 policy and practice claim); *Converse v. City of Kemah*, 961 F.3d 771, 776–80 (5th Cir. 2020) (refusing to grant qualified immunity to officers

are generally inapposite, plaintiff then asks the Court to "infer" from them that Director Faust violated a "clearly established" principle, Pl.s' Opp'n at 9, 11, which request is antithetical to the requirement that a principle must be "dictated by controlling authority or a robust consensus of cases of persuasive authority" to be "clearly established," *Wesby*, 583 U.S. at 63.

Qualified immunity thus protects Director Faust from personal liability for failure to train based on CDF's policies and practices.  Accordingly, Count I against Director Faust is dismissed.

### B.    Failure to Accommodate (Counts II and III)

"The ADA and the Rehabilitation Act require the District to 'make reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability.'"  *Minter v. District of Columbia*, 809 F.3d 66, 69 (D.C. Cir. 2015) (quoting 42 U.S.C. § 12112(b)(5)(A)); *see also* 29 U.S.C. § 794(d).  To state a claim under either statute, a plaintiff must allege that (1) "he is a qualified individual with a disability"; (2) "he is being excluded from participation in, or is being denied benefits, services, programs, or other activities for which a public entity is responsible, or is otherwise being discriminated by the public entity"; and (3) "such exclusion, denial of benefits, or discrimination is by reason of his disability."  *Pierce v. District of Columbia*, 128 F. Supp. 3d 250, 267 (D.D.C. 2015) (Brown Jackson, J.).  Defendants do not dispute that decedent was a "qualified individual," that DOC constitutes a "public entity," or that custodial services are "benefits, services, programs, or other activities."

---

who, "despite [their] knowledge and training regarding suicidal detainees," provided decedent with a blanket, did not get rid of tie-off points on the bunk bed, and did not adequately monitor decedent); *Penn v. Escorsio*, 764 F.3d 102, 111 (1st Cir. 2014) (refusing, at the summary judgment stage, to grant qualified immunity to officers based on defendants' concession that "clearly established law" required officers to take "*some* reasonable measures to thwart a known, substantial risk that a pre-trial detainee will attempt suicide").

The only question is whether plaintiff has alleged a failure to accommodate by reason of decedent's disability.  *See* Defs.' Mot. at 19.

Plaintiff alleges that "[d]espite [decedent's] known and obvious disability—his mental illness and his repeated attempts to self-harm—[the] District of Columbia failed to reasonably accommodate his disability [by] failing to provide him with access to a reasonably safe place of confinement that would not place him at risk for self-harm or suicide, which the District of Columbia offers to other detainees by constructing cells to be reasonably safe and by performing services like monitoring to ensure continuous safety."  Compl. ¶ 56.  Put differently, plaintiff alleges that the District failed to accommodate his disability when CDF staff placed him alone in a general population cell with inadequate monitoring.  *Id.* ¶¶ 25, 28, 33.[6]  These allegations are sufficient to state a failure to accommodate claim.

Rather than engage with plaintiff's allegations about the need for safe construction of cells and continuous monitoring, defendants focus on only plaintiff's allegation that decedent "required mental healthcare and other services sufficient to protect him from harming himself."  Defs.' Mot. at 19 (citation omitted).  Defendants are correct that claims for inadequate medical treatment are not cognizable under the ADA, *see Tardif v. City of New York*, 991 F.3d 394, 405

---

[6]      The Complaint appears to state ADA and Rehabilitation Act claims against the District—not Director Faust.  *See* Compl. ¶¶ 55–56 (alleging that the "*District of Columbia* was responsible for ensuring that individuals in custody with known disabilities are provided with reasonable accommodations," and that the "*District of Columbia* failed to reasonably accommodate his disability [by] failing to provide him with access to a reasonably safe place of confinement" (emphasis added)).  Despite acknowledging that the ADA and Rehabilitation Act claims "turn[] on the same essential facts" and allegations, Pl.'s Opp'n at 13, plaintiff, in opposition, states that Count II "alleges that the individual Defendants failed to accommodate his disability," in violation of the ADA, whereas Count III "alleges a Rehabilitation Act . . . claim against the District of Columbia," Pl.'s Opp'n at 3.  The Court understands plaintiff's reference to "individual Defendants" to refer not to Director Faust, but to other CDF staff members, such as "Officer Akaie," whose conduct plaintiff alleges is attributable to the District, because the Complaint alleges no facts directly attributable to Director Faust, and the parties' briefing on the ADA claims does not concern Director Faust.  In any case, Director Faust cannot be sued under the ADA or Rehabilitation Act in his individual capacity, *see Gary v. Long*, 59 F.3d 1391, 1399–40 (D.C. Cir. 1995), and any ADA or Rehabilitation Act claims against him, in his official capacity, are duplicative of the claims against the District, *see Day v. District of Columbia*, 894 F. Supp. 2d 1, 33 (D.D.C. 2012) (collecting cases).

(2d Cir. 2021) (explaining that claims that plaintiff received inadequate medical treatment for her disability are not cognizable under the ADA); *Brown v. Meisner*, 81 F.4th 706, 709 (7th Cir. 2023) (similar); *Nasious v. Coloradi*, 495 F. App'x 899, 902 (10th Cir. 2012) (similar), and thus, to the extent plaintiff's ADA and Rehabilitation Act claims turn on defendants' failure to provide adequate "mental healthcare and other [medical] services," Compl. ¶ 53, these claims are dismissed.  Plaintiff's claim, however, does not allege only substandard medical care.  Rather, as explained, plaintiff alleges that decedent was denied the benefit of "a reasonably safe place of confinement" in the form of "a suicide-resistant cell" with adequate monitoring.  Compl. ¶¶ 33–34, 56.  These allegations are not inadequate treatment claims.  *See Brown*, 81 F.4th at 709 (concluding that plaintiff's claim that "defendants failed to accommodate his disabling knee condition when they denied him a lower bunk, and perhaps other accommodations" survived a summary judgment motion, and rejecting defendants argument that such claim involved "allegations of medical malpractice," which the ADA "does not create a remedy for" (citation omitted)); *Tardif*, 991 F.3d at 406–07 (distinguishing a medical malpractice claim that is not cognizable under the ADA with a claim that "the City systematically delays or denies pre-arraignment detainees reasonable medical services for their disabilities").[7]

Accordingly, defendants' motion to dismiss Counts II and III is denied.

---

[7]    Acknowledging that "many courts have authorized plaintiffs to establish intentional conduct by establishing that the defendant acted with 'deliberate indifference' to the plaintiff's rights," *Pierce*, 128 F. Supp. 3d at 278, defendants argue that plaintiff's deliberate indifference claim in Count I should be dismissed and thus cannot support an ADA or Rehabilitation Act claim, *see* Defs.' Mot. at 20.  This argument need not be addressed because plaintiff's ADA and Rehabilitation Act claims do not rely on plaintiff's allegations of deliberate indifference.  *See* Compl. ¶¶ 47–59 (ADA), 60–64 (Rehabilitation Act); *see also BEG Invs., LLC v. Alberti*, 85 F. Supp. 3d 13, 26 (D.D.C. 2015) ("[A] complaint may not be amended by the briefs in opposition to a motion to dismiss." (citation omitted)).

### C.      Common Law Claims

"When a federal court has an independent basis for exercising federal jurisdiction, it may, in certain circumstances, also exercise pendent, or supplemental, jurisdiction over related claims under state law." *Women Prisoners of D.C. Dep't of Corr. v. District of Columbia*, 93 F.3d 910, 920 (D.C. Cir. 1996).  To determine whether to exercise supplemental jurisdiction, a court (1) determines whether the state and federal claims derive from a common nucleus of operative facts, and then (2) decides whether to exercise its discretion to exercise supplemental jurisdiction over the state claim.  *See Shekoyan v. Sibley Int'l*, 409 F.3d 414, 418–19 (D.C. Cir. 2005); *Rush v. Fed. Nat'l Mortg. Ass'n*, 707 F. App'x 9, 10 (D.C. Cir. 2017).  Here, the state and federal claims derive from the same facts—the circumstances surrounding decedent's suicide—and the parties agree that supplemental jurisdiction should be exercised over the state law claims, which involve no novel or complex issues of state law.  *See* Defs.' Mot. at 20–21; Pl.'s Opp'n at 13. Accordingly, the Court will exercise supplemental jurisdiction over plaintiff's state law claims.

Defendants move to dismiss plaintiffs' state law claims of negligence and wrongful death against Director Faust, which claims will be addressed *seriatim*, but do not move to dismiss these same claims against the District, which claims thus remain pending.

### 1.      *Negligence (Count IV)*

Plaintiff brings a single negligence claim, based on the exact same factual allegations, against the District and Director Faust.  *See* Compl. ¶¶ 65–72.  The Complaint's factual allegations are sparse, stating only that defendants owed decedent "a duty of reasonable care . . . to protect him from self-harm and ensure his safety as a pretrial detainee," and breached this duty, by engaging in "unlawful acts, omissions, policies and practices."  *Id.* ¶¶ 67, 70.  Such "unlawful acts, omissions, policies and practices" include placing decedent alone "in a general

population cell, with access to implements with which he could harm himself, including bedsheets," ignoring decedent when he told CDF staff that he was suicidal, with one correctional officer even encouraging decedent to kill himself and doing "nothing to mitigate the effects of this comment thereafter," failing to monitor decedent sufficiently frequently, and ignoring their rounds. *Id.* ¶¶ 25, 28, 31–33, 35.  None of these allegations pertain to Director Faust.  Since "public officials are not vicariously responsible for the acts of their subordinates," *Haynesworth v. Miller*, 820 F.2d 1245, 1259 (D.C. Cir. 1987), *abrogated on other grounds by Hartman v. Moore*, 547 U.S. 250 (2006), the negligence claim against Director Faust must be dismissed.

In response, plaintiff argues that these "allegations support the negligence claim, not under a vicarious liability theory but on the basis that, by failing to implement suicide prevention measures, [Director] Faust breached his duty to protect [decedent's] safety and was the proximate cause of his death."  Pl.'s Opp'n at 15.  As explained, such allegation is not in the Complaint.  Indeed, when describing the allegations in the Complaint supporting the negligence claim against Director Faust, plaintiff states that "individual Defendants knew [decedent] was a suicide risk and failed to take any measures to monitor and protect him," resulting in decedent's suicide, and "[i]t is therefore reasonable to infer that by his acts and omissions, [Director] Faust caused [decedent's] death."  *Id.* at 14.  Similarly, when describing the negligence claim against the District, plaintiff explains that she "seek[s] to hold the District of Columbia liable for the state law torts committed by its agents within the scope of their employment."  *Id.*  These descriptions make clear that the negligence claim, as alleged in the Complaint, attempts to hold Director Faust liable for negligence based on a theory of vicarious liability.  While plaintiff might now seek to modify these allegations, the law is well-settled that "a complaint may not be amended by the briefs in opposition to a motion to dismiss."  *BEG Invs., LLC v. Alberti*, 85 F.

Supp. 3d 13, 26 (D.D.C. 2015) (citation omitted); *see also Williams v. Spencer*, 883 F. Supp. 2d

165, 181 n.8 (D.D.C. 2012) (collecting cases); *Jones v. Ass'n of Am. Med. Colls.*, No. 22-cv-

1680 (EGS), 2023 WL 2327901, at *8 (D.D.C. Mar. 2, 2023) (same).

Accordingly, the negligence claim against Director Faust is dismissed.

### 2. *Wrongful Death (Count V)*

In relevant part, the District of Columbia's Wrongful Death Act allows "the spouse or

domestic partner" of a person who is wrongfully killed "to maintain an action and recover

damages" when "the death of a person is caused by the wrongful act, neglect, or default of

a[nother] person."  D.C. Code § 16-2701(a); *see also Nelson v. Am. Nat'l Red Cross*, 26 F.3d

193, 199 (D.C. Cir. 1994) ("[T]he wrongful death provision gives a right of action to [a

decedent's] survivor who suffers a loss because of his death.").  "The District of Columbia Court

of Appeals has interpreted this language to mean that 'a cause of action for wrongful death arises

only if the deceased could have brought a cause of action for injuries if death had not ensued."

*Nelson*, 26 F.3d at 199 (alteration in original accepted) (quoting *Greater Se. Cmty. Hosp. v.

Williams*, 482 A.2d 394, 395 (D.C. 1984)).  Accordingly, "a wrongful death action is derivative

in nature," meaning that the decedent must have "a viable cause of action at the time of death" to

bring a wrongful death action.  *Id.*; *see, e.g.*, *Waldo*, 2024 WL 3251222, at *4 (dismissing a

wrongful death claim because the underlying negligence claim was also dismissed).  Here,

because the § 1983, ADA, Rehabilitation Act, and negligence claims against Director Faust are

dismissed, so too is the wrongful death claim.

## IV.   CONCLUSION

For the foregoing reasons, even with all the facts and assumed inferences drawn in its

favor, plaintiff has failed to state a claim for deliberate indifference based on failure to train, in

violation of the Fifth Amendment; failure to accommodate in violation of the ADA and Rehabilitation Act; negligence; or wrongful death against Director Faust.  All claims against Director Faust are thus **DISMISSED**.

Plaintiff, however, has alleged sufficient facts to state a claim for deliberate indifference based on failure to train, in violation of the Fifth Amendment; failure to accommodate in violation of the ADA and Rehabilitation Act; negligence; and wrongful death against the District of Columbia, and all claims against the District survive.

Accordingly, defendants' Partial Motion to Dismiss, ECF 20, is **GRANTED IN PART AND DENIED IN PART**.

An order consistent with this Memorandum Opinion will be entered contemporaneously.

Date:  July 19, 2024

_____
**BERYL A. HOWELL**
United States District Judge