**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DOMINIQUE WATSON, on behalf of herself and as personal representative of the Estate of Giovanni Love,<br><br>Plaintiff,<br><br>v.<br><br>DISTRICT OF COLUMBIA, *et al.*,<br><br>Defendants. | Civil Action No. 23-1670 (BAH)<br>Judge Beryl A. Howell |
| DOMINIQUE WATSON, on behalf of herself and as personal representative of the Estate of Giovanni Love,<br><br>Plaintiff,<br><br>v.<br><br>UNITY HEALTH CARE INC., *et al.*,<br><br>Defendants. | Civil Action No. 24-2281 (BAH)<br>Judge Beryl A. Howell |
| DISTRICT OF COLUMBIA,<br><br>Third-Party Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Third-Party Defendant. | Civil Action No. 23-1670 (BAH)<br>Judge Beryl A. Howell |

**MEMORANDUM OPINION**

Pending before the Court is a motion to amend the complaint by plaintiff Dominique Watson ("plaintiff"), in her individual capacity and as the putative personal representative of the Estate of her husband, Giovanni Love ("decedent" or "Love"), in connection with decedent's

death by suicide while incarcerated at the District of Columbia's Central Detention Facility ("CDF"). Pl.'s Mot. Leave to Amend Complaint to Re-Assert Claims Against Corporal Sunday Samuel Akanbi ("Pl.'s Mot."), ECF No. 108; Pl.'s Mem. Law & Pts. Auth. ("Pl.'s Redacted Mem."), ECF No. 108; Pl.'s Mem. Law & Pts. Auth. ("Pl.'s Mem."), ECF No. 109-1; Pl.'s Mot., Ex. A, Pl.'s Proposed Second Am. Consol. Compl. ("Proposed SAC"), ECF No. 108-2. The original complaint named as defendants the District of Columbia ("the District"), Unity Health Care, Inc. ("Unity"), "multiple" "John Does," who were "staff" of the District or Unity, and two individual defendants, including "Officer Akaie," who is described as a "guard" at CDF. *See* Compl. ¶ 4-8, ECF No. 1. As a result of prior rulings, the parties' stipulations, consolidation with a separate suit filed by plaintiff, and a consolidated amended complaint, the defendants to this action are currently the District, Unity, and the United States, as the statutory employer of Unity. *See* Pl.'s Consolidated Compl. ("Consol. Compl.") ¶ 4-6, ECF No. 95; *see also Watson v. District of Columbia ("Watson II"),* No. 23-cv-1670 (BAH), 2025 WL 35534, at *1 (D.D.C. Jan. 6, 2025); *Watson v. District of Columbia* ("*Watson I*"), No. 23-cv-1670 (BAH), 2024 WL 3471262, at *1 (D.D.C. July 19, 2024). The United States is also a third-party defendant to the action because the District filed a third-party complaint impleading the United States for contribution. *See* Third Party Compl. ¶ 5, 10-12, ECF No 46. The original individual defendant identified as "Officer Akaie" was dismissed due to plaintiff's failure timely to identify and serve him. *See Watson I*, 2024 WL 3471262, at *1 n.1.

Now, having confirmed, without apparent dispute from the District, the identity of "Officer Akaie" to be "Corporal Sunday Samuel Akanbi," plaintiff seeks leave to amend her complaint to add as an individual defendant Akanbi, "also known as 'AK,'" who "is a guard at the Jail," Proposed SAC ¶ 5, to three of the five counts in the Complaint, claiming: (1) against

the District and Akanbi, deliberate indifference, in violation of the Fifth Amendment, pursuant to 42 U.S.C. § 1983, Proposed SAC ¶¶ 38-47 (Count I); (2) against all defendants, negligence, under District of Columbia law, *id*. ¶¶ 66-73 (Count IV); and (3) against all defendants, wrongful death, under District of Columbia law, *id*. ¶¶ 74-76 (Count V). Though the District has been aware since 2022, even before the initiation of this lawsuit, that Akanbi was the guard who allegedly engaged in the conduct attributed to him in the original complaint, the District did not disclose this information until four years later and two months before plaintiff sought leave to amend the complaint. Nonetheless, the District opposes the proposed amendment. *See* Def. District of Columbia's Opp'n Pl.'s Mot. Leave Re-Assert Claims Against Corporal Akanbi ("District's Opp'n"), ECF No. 111. Acknowledging the lapse of approximately three years since the original complaint was filed, plaintiff argues that she should be permitted to amend her complaint to add this individual defendant because the delay was the result of her inability, until late April 2026, to ascertain Akanbi's identity. *See* Pl.'s Mem. at 1-2, 6.[1]

For the reasons explained more fully below, plaintiff's motion is granted.

## I. BACKGROUND

The factual and procedural background relevant to resolving the pending motion, including assessing the delay and potential prejudice attendant to the proposed amendment, is summarized next, in chronological order, relying on the allegations in the operative consolidated complaint and the exhibits submitted in connection with the motion to amend.

[1] Sealed content referenced in this Memorandum Opinion is unsealed to the extent necessary to explain the Court's reasoning. *See United States v. Reeves*, 586 F.3d 20, 22 n.1 (D.C. Cir. 2009); *Krukas v. AARP, Inc.*, No. 18-cv-1124 (BAH), 2021 WL 5083443, at *2 n.3 (D.D.C. Nov. 2, 2021). The separate dispute between the District and plaintiff over which of four exhibits submitted by plaintiff in support of the motion for leave to amend the complaint must be filed under seal, *see* Pl.'s Mot. for Leave to File Materials Under Seal ("Pl.'s Sealing Mot."), ECF No. 109; District's Resp. to Oct. 1, 2026 Minute Order ("District's 1st Resp."), ECF No. 114; Pl.'s Resp. to This Court's Oct. 5, 2026 Minute Order ("Pl.'s Resp."), ECF No. 115; District's Resp. to Oct. 7, 2026 Minute Order ("District's 2nd Resp."), ECF No. 116, is resolved in a separate Memorandum and Order, ECF No. 119. Relevant here, the Sealing Motion, and the accompanying unredacted memorandum in support of her motion for leave to amend the complaint, is unsealed.

### A. Decedent's Detention at D.C. Department of Corrections

In late May 2022, decedent was arrested and detained at CDF, a component of the D.C. Department of Corrections ("DOC"). *See* Consol. Compl. ¶ 20. According to plaintiff's complaint, on June 3, 2022, CDF staff "removed Mr. Love from suicide precautions and moved him to a cell that did not permit careful and constant monitoring" and that "had access to implements with which he could harm himself, including bedsheets," *id.* ¶ 11-23, and that was where he remained until his death six days later, *id.* ¶ 34. While decedent was incarcerated, "Mr. Love was significantly agitated," "spoke about killing himself," and "began to engage in acts of self-harm, including cutting himself." *Id.* ¶ 24-25. "He also became despondent, and by June 6 he had written a suicide note to his wife." *Id.* ¶ 26. Despite decedent telling both DOC and health staff that he was suicidal, he was not provided with help. *See id.* ¶ 27. "Instead at least one correctional official encouraged Mr. Love to kill himself, and did nothing to mitigate the effect of this comment thereafter." *Id.* ¶ 28; *see also* Compl. ¶ 32 ("Instead at least one correctional official, Defendant Akaie, encouraged Mr. Love to kill himself, and did nothing to mitigate the effect of this comment thereafter."). On June 9, 2022, decedent died by suicide, after he "fashioned a noose out of a bedsheet and hung himself." Consol. Compl. ¶ 34.

### B. DOC Internal Investigation

The same day that decedent was found dead in a CDF cell, on June 9, 2022, Charles White, a DOC official "tasked with investigating Love's death," interviewed a DOC officer, Lieutenant Kiana Strickland, who responded to decedent's cell after a medical emergency alert had been announced. Pl.'s Mem. at 5.[2] During that interview, Lt. Strickland reported being told by decedent's cellmate, "that last night he [referring to decedent] was requesting mental

[2] As noted, *see supra* n.1, plaintiff's motion for leave to submit four exhibits under seal has been resolved, and both the Sealing Motion, as well as the interview transcript of Lt. Strickland is unsealed, except for a small portion of that interview.

health . . . [a]nd his cellmate said that he was being ignored . . . [and] he wrote a suicide note last night." Pl.'s Sealing Mot., Ex. I, Interview Tr. Lt. Kiana Strickland, dated June 9, 2022 ("Strickland Interview") at 17:16-18:2, ECF No. 109-2). In addition to decedent's cellmate, Lt. Strickland reported that yet another detainee in the next cell from decedent's cell told Strickland about an incident occurring the night before decedent's death, when a correctional officer ("C.O.") named "A.K." had the following response to decedent, who "'kept telling him that he was going to kill himself, and the C.O. said, I do not give a fuck, kill yourself.'" *Id.* at 18:6-19:7.

The next day, on June 10, 2022, White conducted another interview, this time of D.A., who was "Love's cellmate at the time of Love's death," and who recounts witnessing a similar interaction between Love and Akanbi. Pl.'s Mem. at 5. D.A. testified that the night before decedent's death, decedent told D.A., "I am being bullied by inmates, the C.O. not taking me serious about killing myself," and then, "the C.O. walk past, A.K. walk past, he will be like, 'I am felling suicidal, I am going to kill myself, I am going to kill myself.' The C.O. is talking about, 'You'll be all right.'" Pl.'s Sealing Mot., Sealed Ex. J, Interview Tr. D.A., dated June 10, 2022 ("D.A. Interview") at 2:24-3:10; 6:24-7:20, ECF No. 109-3. When White indicates that after decedent moved into D.A.'s cell, "then everything is fine," D.A. immediately corrects White, stating, "No, everything is not fine . . . he telling the C.O., 'I am suicidal; I want to kill myself.' . . . [a]nd the C.O. would walk past like he didn't give a fuck at all." *Id*. at 4:21-5:12. In response to White's direct question asking for the identity of that C.O., D.A. states, "A.K." *Id*. at 5:13-5:17. When asked to repeat the "actual words" used, *id.* at 7:4, D.A. reported that decedent "said, 'I am going kill myself. I am going to hang it up,'" and he told this to A.K. "like two, three times," but A.K. "looked like he stopped for a second, and then he kept walking," *id.* at 7:6-7:20. Later in the interview, D.A. stated, "There's a whole bunch of A.K.s in the jail, so I

don't know," *id*. at 15:21-15:22, and "That's the one that ran up the steps faking like he wanted to do something," *id*. at 16:3-16:5, and White assured D.A. that, "I think we can identify who this A.K. is . . . he worked yesterday. He was on shift . . . [W]e're all on the same page. We know who we're talking about," *id*. at 15:19-16:8.

DOC's Office of Investigative Services ("OIS"), issued a "Final Report, dated "October 2022," and "Prepared: 09/27/2022," with the Lead Investigator identified as Charles White, to "identify the facts and circumstances related to the death of Giovanni Love . . . while in the custody of [DOC]." Pl.'s Mot., Ex. G, Department of Corrections Office of Investigative Services Final Report ("OIS Report") at 1, ECF No. 108-8. This OIS Report states that, "[d]uring his May 25, 2022, intake process, Giovanni Love revealed having suicidal ideation throughout his comprehensive mental health intake assessment, suicide risk assessment and mental health screening process" and "was housed in [a mental health] unit from May 26, 2022, until he was medically cleared to be housed in Northeast One Protective Custody housing unit on June 3, 2022." *Id*. at 2. The OIS Report goes on to describe the events on June 9, 2022, stating that after decedent's cellmate "informed Corporal Sunday Akanbi that" decedent "[h]ad tied something around his neck," "Akanbi responded to the cell and observed Love hanging with a white sheet wrapped around his neck with the other end tied to the cell vent. [Akanbi] called a medical emergency on his radio," "cut inmate Love down from his hanging position, and laid him on the cell floor," before "[r]esponding officers and supervisors arrived on the unit and initiated CPR." *Id.* at 3.

The OIS Report reviewed various internal documents, including "DCDC-1(s) submitted by assigned officers," which were described as "appear[ing] to be thorough, accurately describing events that led up to, and proceeded the medical emergency" and "indicat[ing]" that

"inmate Love did not indicate or show signs of his intention to commit self-harm." *Id*. at 4. Notably, this Report neither describes or mentions the contrary information provided in the two interviews conducted of Lt. Strickland and D.A. as part of the internal investigation on June 9 and 10, 2022, and does not identify those two, or any other, interviews conducted by White or other investigators as part of the internal investigation. *See id*. at 7 (listing attachments to OIS Report). The OIS Report concluded that, "[d]uring the Friday, June 13 [sic], 2022, medical emergency . . . DOC Officers along with the Unity Medical staff appeared to follow agency policy prior to, and subsequent to the medical emergency associated with the decedent[,]" and particularly highlighted that "[b]eing unaware of his intent to commit self-harm, the uniformed staff conducted the required security rounds every thirty (30) minutes as required per agency policy within the shift." *Id.* at 6. Again, this conclusion was relayed in the OIS Report without comment or any reference to any contrary information provided in the interviews conducted by White on June 9 and 10, 2022, or any other interviews that may have been conducted as part of the internal investigation.

**C. Filing of Complaint in this Case**

In a letter dated July 11, 2022, James Norris, who was detained near decedent's cell at the time of the latter's death, relayed to plaintiff in a letter that "[t]he officer who told Love to kill himself name is Akaie." Pl.'s Mem. at 2 (quoting Pl.'s Mot., Ex. H, Letter from James Norris to Dominque Watson dated July 11, 2022 ("2022 Norris Letter"), ECF No. 108-9). "Based on this information, Plaintiff named 'Officer Akaie' as a defendant in her Original Complaint filed June 8, 2023." *Id.*; Compl. ¶¶ 6, 32.

When an attempt was made, on June 20, 2023, to serve "Officer Akaie" in person at CDF, however, CDF employees advised "there was no 'Officer Akaie.'" Pl.'s Mem. at 1 (citing Pl.'s Mot., Ex. D, Investigative Due Diligence Affidavit, ECF No. 108-5). This prompted

plaintiff to seek an extension of time to serve "Officer Akaie," along with a request for "limited discovery" from the District "in the form of requests for production seeking an employee roster" to "aid in determining the Defendant's proper identity and/or current whereabouts." Pl.'s Mot. for Extension of Time to Serve Defendant and Leave to Serve Limited Disc., at 1-2, ECF No. 19.

The extension for service request was promptly granted, *see* Minute Order (Sep. 12, 2023), but the District opposed the discovery request, explaining that "no employee with the first or last name 'Akaie' worked at the jail in June 2022 (or ever)," and representing that "providing an employee roster of roughly 1,000 employees will not help uncover this defendant's identity." District's Resp. Pl.'s Req. Early Disc. ("Defs.' Resp.") at 2, ECF No. 21. The District acknowledged plaintiff's effort to identify the jail guard "who, on an unspecified date, 'encouraged Love to kill himself, and did nothing to mitigate the effect of this comment,'" *id*. at 1 (quoting Compl. ¶¶ 6, 32), but represented that "[w]ithout further information, Defendants cannot assist," and that "Officer Akaie" would, like "the other John Doe Defendants," be "identified during the normal course of discovery," *id*. at 2. Plaintiff's request for an employee roster was denied, without prejudice, noting that the District had "express[ed] willingness to engage in early discovery, conditioned on entry of a standard protective order, *id.* at 1 n.1, which condition appears reasonable." *See* Minute Order (Sep. 18, 2023). The requested protective order was subsequently entered in October 2023. *See* Minute Order (Oct. 24, 2023); Protective Order, ECF No. 31.

During the ensuing months, the United States filed a motion to dismiss, *see* ECF No. 42, which was denied as moot, *see* Minute Order (Feb. 9, 2024), after plaintiff stipulated to dismissal, without prejudice, as to the United States, *see* Stipulation of Dismissal, ECF No. 44. In addition, the District's partial motion to dismiss, ECF No. 20, was granted in part and denied

in part, and, in relevant part, individual defendant "Officer Akaie" was dismissed for lack of timely service, *see Watson I*, 2024 WL 3471262, at *1 n.1, 9, 11.

**D. Discovery**

Discovery commenced in this case on August 27, 2024, and after multiple agreed-upon extensions, the deadline for discovery currently closes on March 30, 2027, eight months after the filing of plaintiff's pending motion to amend the complaint. *See* Scheduling Orders (Aug. 5, 2024, Aug. 21, 2024, May 8, 2025, Aug. 6, 2025, Nov. 4, 2025, Feb. 10, 2026, June 5, 2026). On September 24, 2024, the District disclosed, as required by Federal Rule of Civil Procedure 26(a)(1), a list of 107 individuals "likely to have discoverable information," District of Columbia's Initial Disclosures ("Rule 26 Disclosure") at I, ¶¶ 1-107, ECF No. 65, including "Corporal Sunday Akanbi" because he "saw Giovanni Love immediately before his death while alive and was the first DOC staffer on scene after this death," District's Opp'n at 6 (quoting Rule 26 Disclosure at I, ¶ 12).

More than a year later, in November 2025, the District produced to plaintiff the October 2022 OIS Report, which plaintiff appeared to access "on or about December 11, 2025." *Id.* at 7. Recall that the only reference in the OIS Report to Akanbi was that he was one of three guards on duty and responded to decedent's cell when alerted to a medical emergency by inmate D.A. *See* OIS Report at 3.

Several months later, on April 27, 2026, plaintiff obtained a declaration from an individual, Arthur Harris, "who was housed near[]" decedent at CDF on the day he died, and who states that: (1) he "heard Love tell correctional officers that he was suicidal and that he wanted to see a doctor"; (2) he heard a correctional officer, "who inmates referred to as 'AK,' tell Love 'fuck you' and to kill himself after he asked for help"; and (3) he "believe[s] AK's last name is Akanbi." Pl.'s Mot., Ex. E, Decl. Arthur Harris ("Harris Decl."), ECF No. 108-6.

In the next two weeks, after nearly two years of discovery, the District disclosed two sets of materials that, according to plaintiff, has enabled her to confirm, as Harris reported, that the identity of the person called "Akaie" referenced in the 2022 Norris letter from decedent's cellmate, is Akanbi. *See* Pl.'s Mem. at 3-6. First, on June 1, 2026, the District responded to a "discovery request" from plaintiff "seeking information related to suicide prevention." *Id.* at 3. In that response, the District explained to plaintiff how to sort through an online database of publicly available documents of "nearly 2,000 pages" and, as a result, plaintiff was able to find "employee rosters for the period in which [decedent] was incarcerated." *Id.* at 3-4. Plaintiff notes that "[t]here are only two DOC employees whose first or last names begin with "Aka": Maduabuchi Akaigwe and Sunday Akanbi. . . Of those two individuals, only Sunday Akanbi was working in [decedent's] cell block around the time of his death. . . Consequently, had the District directed Plaintiff to the publicly-available (albeit difficult to locate without direction) employee rosters in September 2023, or had the District not represented that employee rosters would not lead to discovery of the Defendant's identity, there is a good chance that 'Officer Akaie' could have been identified before the Rule 4(m) [service] period expired." *Id.* at 4.

Second, on June 11, 2026, the District produced to plaintiff the recordings of interviews of Lt. Strickland and D.A. *See id.* at 5. Then, five days later, during his June 16, 2026, deposition, "[Charles] White confirmed that he understood Officer AK to be Sunday Akanbi." *Id.* (citing Pl.'s Mot., Ex. K, Excerpts from Dep. Tr. Charles White, dated June 16, 2026 ("White Dep.") at 209:19-210:6, ECF No. 108-10).

On August 4, 2026, plaintiff filed the pending motion to amend her complaint, which is now ripe for review.

## II. LEGAL STANDARD

Leave to amend a complaint "should ordinarily be freely granted" unless a "valid ground" for denial is provided, *Gaubert v. Fed. Home Loan Bank Bd.*, 863 F.2d 59, 69 (D.C. Cir. 1988) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)), "such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.," *Foman*, 371 U.S. at 182. Although "the grant of leave to amend a complaint might often occasion some degree of delay and additional expense, [] leave still should be 'freely given' unless prejudice or delay is 'undue.'" *Barkley v. U.S. Marshals Serv. ex rel. Hylton*, 766 F.3d 25, 39 (D.C. Cir. 2014) (quoting *Foman*, 371 U.S. at 182). The party opposing the amendment bears the burden to show why leave should not be granted. *See Gudavich v. District of Columbia*, 22 F. App'x. 17, 18 (D.C. Cir. 2001) (per curiam) (affirming order granting leave to amend because non-movant "failed to show prejudice from the district court's action in allowing the [movant's] motion to amend").

## III. DISCUSSION

The District opposes plaintiff's motion to amend the complaint to add Sunday Samuel Akanbi as a named defendant to three of the five claims, arguing this motion should be denied on three grounds: (1) the proposed claims against Akanbi are "futile because they duplicate [] existing claims against the District"; (2) plaintiff's delay in amending the complaint is "unjustifiable"; and (3) the amendment would "materially prejudice Corporal Akanbi." District's Opp'n at 4, 6, 8 (citation modified).[3] None of these reasons is sufficient, considered alone or together, to warrant denial of plaintiff's motion to amend the complaint.

---

[3] The District also raises a purported procedural deficiency regarding plaintiff's filing of the pending motion to amend, complaining that plaintiff did not serve the District "with the unredacted version" of documents on which

### A. Futility

The District first contends that plaintiff's three proposed claims against Akanbi—*i.e.*, the Section 1983 claim and the negligence and wrongful death claims—are "futile" "because they duplicate her existing claims against the District." *Id.* at 4. The reason for this duplicity, according to the District, is that plaintiff failed to note the "capacity in which she proposes to sue Corporal Akanbi," *id*. (citing Proposed SAC ¶ 5), and the proposed complaint should be read to "present[] an official capacity claim against Corporal Akanbi, *id.* at 5. As support for this reading of the proposed complaint, the District points to the D.C. Circuit's guidance that "[t]he Supreme Court has noted that when a complaint fails to specify the capacity in which a government official is sued, the course of proceedings will usually indicate the sort of liability the plaintiff seeks to impose." *Id.* (quoting *Atchinson v. District of Columbia*, 73 F.3d 418, 425 (D.C. Cir. 1996)). The District goes on to argue that the "course of proceedings" in this case indicates that plaintiff meant to sue Akanbi in his official capacity for the Section 1983, negligence, and wrongful death claims, based on a statement in the pending motion to amend that the new claims against Akanbi would "relate back" to the claims made in original complaint. Specifically, the District notes that plaintiff stated that "Akanbi and the District's liability rise and fall together" and that "Plaintiff's negligence and wrongful death claims against the District and Akanbi are based on the same factual allegations." *Id.* (quoting Pl.'s Mem. at 13). "This overlap," according to the District, "also applies to [plaintiff's] 42 U.S.C. § 1983 count, where

---

she relies in her motion, and this therefore constitutes "a violation of this Court's procedure for attorneys to follow when electronically filing sealed documents." District's Opp'n at 10. Of course, the District was the source of the unredacted documents so cannot claim to have no knowledge of their contents. Indeed, the District does not claim to have been hampered in its ability to respond to plaintiff's motion. At any rate, the District could simply have raised and resolved this issue directly with plaintiff rather than demanding judicial attention, as demonstrated by the fact that after the District filed its opposition, plaintiff realized the "error" and "Plaintiff's counsel emailed the unredacted filings to the District's counsel and offered Plaintiff's consent to the District filing an amended response," Pl.'s Reply at 7, but defendant opted not to submit an amended response, *see id.* at 7-8. In these circumstances, this proffered ground for denying plaintiff's motion to amend is almost silly.

the purportedly new allegation against Corporal Akanbi is that he 'acted' pursuant to the District's policies." *Id.* (quoting Proposed SAC ¶ 47).

The District is correct up to a point. To be sure, plaintiff's proposed amended complaint is silent as to whether Akanbi is named in his official or personal capacity for the Section 1983 claim. *See generally* Proposed SAC. Also true is that courts routinely dismiss official capacity Section 1983 claims when the government employer is already a named defendant since "[o]fficial-capacity suits . . . generally represent only another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 165 (1985) (citation omitted); *see, e.g.*, *Lewis v. District of Columbia*, 161 F. Supp. 3d 15, 36 (D.D.C. 2015) ("Because Plaintiff's § 1983 claim under the Fourth Amendment will proceed against the District, the Court will dismiss it as redundant against Gray and Fields in their official capacities."); *Cooke-Seals v. District of Columbia*, 973 F. Supp. 184, 187 (D.D.C. 1997) (where employees are sued in an official capacity, "the claims against the employees *merge* with the claim against the employer"). Thus, if plaintiff proposed to sue Akanbi in his official capacity, the District would be right that "the proposed claims against Akanbi are duplicative of [plaintiff's] existing claims against the District" and the proposed amendment could be deemed "a futile addition of a duplicative official capacity claim against a District employee where the District is already a defendant." District's Opp'n at 5.

The fatal flaw in the District's argument is that, as plaintiff has clarified, Akanbi is "identified as a primary tortfeasor" and sued in his *personal* capacity, not his official capacity. *See* Pl.'s Reply Supp. Mot. Amend Compl. ("Pl.'s Reply"), at 2-4, ECF No. 113. The proposed complaint bears out that plaintiff's proposed claims against Akanbi are in his personal capacity. For example, the proposed complaint, in its fact section, alleges that "Defendant Akanbi[]

encouraged Mr. Love to kill himself, and did nothing to mitigate the effect of this comment thereafter." Proposed SAC ¶ 29. In other words, contrary to the District's suggestion, plaintiff alleges more than that Akanbi acted pursuant to the District's allegedly unconstitutional policies, which are described as inadequate mental illness monitoring and treatment that constituted deliberate indifference, *see id.* ¶¶ 39-44, and further that Akanbi directly and individually engaged in his own misconduct that plaintiff contends constitutes a Section 1983 violation, *see Kentucky*, 473 U.S. at 166 ("On the merits, to establish *personal* liability in a § 1983 action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right."). As plaintiff contends, she "would not go to the trouble of seeking leave to amend Plaintiff's complaint unless the amendment would add something new to this case—here, the opportunity to hold Officer Akanbi liable in his personal capacity, and the opportunity to recover compensatory and punitive damages from Officer Akanbi." Pl.'s Reply at 2.

The just-described alleged wrongdoing identifying Akanbi as directly engaged in intentional conduct that likely did not comport with DOC policy on how to manage an inmate expressing suicidal ideation is sufficient to show that the negligence and wrongful death claims are asserted against Akanbi in his personal capacity. Thus, for the same reason as the Section 1983 claim, these two common law claims are also not futile. Consequently, the District fails to show that plaintiff's proposed claims against Akanbi are "duplicative" of the same claims against the District and therefore also fails to show that leave to amend should be denied because these proposed claims would be "futile."

**B. Delay**

The District next contends that the delay in seeking to amend the complaint was unjustifiable, but plaintiff has marshaled persuasive reasons to conclude otherwise. In explaining the nearly three-year delay in adding Akanbi as a defendant, plaintiff states that she "filed the

instant motion promptly after receiving evidence confirming that Akanbi is the 'Officer Akaie' named in Plaintiff's Original Complaint." Pl.'s Mem. at 9. In tracing the prior discovery in this case, she "credited," as did this Court, "the District's representation that no 'Officer Akaie' existed at CDF and that employee rosters would not aid in uncovering his identity." *Id.* Then, "[t]hough DOC took steps to compile and preserve OIS materials in anticipation of defending this lawsuit, the District did not produce these OIS audio recordings until June 11, 2026, and the OIS report itself does not mention any interviews of detainees, let alone that they were audio recorded." Pl.'s Mem. at 6 (citations omitted). Plaintiff explains further that, "[p]rior to June 11, 2026, Plaintiff was not aware (1) that any DOC employees interviewed individuals detained in NE1 following Love's death; (2) that such interviews were audio recorded; (3) that the interviews referenced an Officer 'AK'; or (4) that a DOC employee knew that the Officer 'AK' who detainees referenced was Sunday Akanbi." *Id.* The current record bears out plaintiff's summary of the chronology of relevant discovery produced by the District, and the troubling delays *by the District* in disclosing information allowing plaintiff to connect the dots that the DOC guard who allegedly heard decedent's expressions of intent to kill himself and responded by encouraging him to do so, was Akanbi.

For its part, the District contends the three-year delay in seeking the proposed amendment to the complaint is unjustified because of three discovery productions to plaintiff that reference Akanbi's name. *See* District's Opp'n at 6-8. First, the District points to its September 2024 Rule 26 Disclosure listing Akanbi as a person who may have discoverable information and describing Akanbi as having seen decedent "immediately before his death while alive and was the first DOC staffer on scene after his death," *id.* at 6, which description, according to the District, should have alerted plaintiff to the fact that "Akaie" was Sunday Akanbi, due to the "the obvious

phonetic similarity between 'Akanbi' and 'Akaie,'" *id.* at 6-7. Second, the District cites the OIS Report prepared on September 27, 2022, and produced to plaintiff more than three years later, on November 19, 2025, and "accessed by [plaintiff] on or about December 11, 2025." *Id.* at 7. The District argues that the OIS Report "provided more detail than the District's Rule 26 Disclosure" and that "[a]ny reasonable reading of the OIS Report should have alerted [plaintiff] to move to add Corporal Akanbi as the improperly named 'Officer Akaie.'" *Id.* at 7. Third, the District says that the Harris Declaration, which plaintiff received on April 27, 2026, states Harris' belief that "AK's last name is Akanbi," *id.*, but nonetheless, the District observes that plaintiff "waited another 99 days to file" the pending motion to amend on August 4, 2026, *id.* None of these three sets of materials demonstrates undue delay in plaintiff connecting the dots that Akanbi was the officer who made the alleged statement to decedent that he should kill himself.

As an initial matter, the District does not explain which information, in the Rule 26 Disclosure or the OIS Report, would have obviously alerted plaintiff to the fact that Akanbi was the person who allegedly told decedent to kill himself—other than the name similarity to the supposed "Akaie." Starting with the Rule 26 Disclosure in September 2024, Akanbi was on the Rule 26 disclosure list of *107 individuals* with potentially relevant information; one of *eighteen* DOC personnel with first or last names beginning with "A", *see* Rule 26 Disclosure at I, ¶¶ 6, 12, 14, 32-33, 42, 45, 47, 52, 63, 66, 75, 78-79, 82, 100, 102, 107, including DOC Sergeant Ayodele, ¶ 100; and one *of 21 individuals* identified as having seen decedent "immediately before his death while alive" and/or "on the scene after his death," *id.* ¶ 97 ("saw Giovannie [sic] Love in the few hours before his death"); ¶ 98 ("saw Giovannie [sic] Love in the few hours before his death and arrived on scene immediately after his death"); ¶¶ 9-10 ( "treated Giovanni Love on scene"); ¶¶ 20, 91 ("arrived on scene and dialed 911 upon Giovanni Love's death"); ¶¶ 92-96,

99-107 ("arrived on scene upon Giovanni Love's death"); ¶ 27 ("observed Giovanni Love after his death and wrote the note in Love's chart that he had passed away"). Akanbi was not identified in the Rule 26 Disclosure as the person identified during the internal investigation interviews over two years earlier, in June 2022, as allegedly making a statement encouraging decedent to follow through on his suicidal intention. Indeed, conspicuously missing from the Rule 26 Disclosure is any mention of two, or possibly more, interviews conducted by Charles White, or others, as part of the OIS internal investigation of decedent's death, which interviews clearly identified Akanbi as the very person who made this alleged statement. *See id*. at II (entitled "Documents, ESI, and Tangible Things In the District's Possession, Custody, or Control (Rule 26(a)(1)(A)(iii))").

Turning next to the OIS Report, this is a peculiar document for the District to rely upon so heavily, given the apparent omission of information derived from the two June 2022 interviews, compounded by the summary conclusions that simply ignore directly contrary evidence. Recall that this report indicates "that inmate Love did not indicate or show signs of his intention to commit self-harm," OIS Report at 4, and that DOC officers were "unaware of his intent to commit self-harm," *id*. at 6, leading to the conclusion that "agency policy prior to, and subsequent to the medical emergency associated with decedent," was followed, *id*. Given that this OIS Report clears DOC officials and, in particular, the on-duty DOC guards, including Akanbi, of any failure to comply with DOC policy, *see* OIS Report at 6, this report would not be an obvious or supportable source for plaintiff to base an allegation that Akanbi was the guard who allegedly made a statement to decedent encouraging him to engage in self-harm.

Moreover, both the omissions and resultant potentially flawed conclusions in the OIS Report only became apparent in disclosures to plaintiff that were made *after* the November 2025

disclosure of this report. To repeat, a glaring omission in the OIS Report is that no reference is made to two, or more, interviews conducted by Charles White, the "Lead Investigator," on June 9 and 10, 2022, providing witness statements contrary to the report's finding, even though other steps taken "[a]s part of the investigative process" for the "in-depth internal valuation associated with staff action, adherence to agency policy and procedure, electronic/technological applications, and/or equipment," were listed. OIS Report at 3 (entitled "INVESTIGATIVE ASSESSMENT" and listing records, databases, Body Worn Camera and other video captures reviewed); *see id*. at 7 (entitled "ATTACHMENTS"). This report also omits additional contrary information that appears, in the current record before the Court, only in excerpts of the deposition of Charles White, taken on June 16, 2026. *See* White Dep. White conceded at his deposition that the OIS Report not only omitted contrary information from the interviews of Lt. Strickland and D.A., *see id.* at 190:1-191:10, but also omitted information provided by a third person, Kareem Green, who said that "Giovanni Love told an officer he was going to kill himself and the officer ignored him," and also said that the morning of decedent's death, when decedent "was sitting at the top of the upper deck and said, I'm going to jump, and that an officer said, Okay, jump." *Id.* at 190:17-191:4. When asked why these statements from three witnesses were omitted from the OIS Report, White responded, "I don't know." *Id*. at 191:10.

Plaintiff's confirmation that Akanbi was the DOC guard who allegedly made the statement encouraging decedent to engage in self-harm came only in late-April 2026 with the Harris Declaration, with further proof accumulating in the next two weeks with disclosure of the interview transcripts of Lt. Strickland and D.A., culminating with the mid-June 2026 deposition of White. The belated disclosure of these two interviews is not explained by the District. Plaintiff's concern that the "District has attempted to shield Akanbi's identity from the outset of

this case," Pl.'s Reply at 6, as the DOC guard who allegedly responded to decedent's expressions of intent to kill himself by encouraging him to do so, finds support based on the handling of the OIS Report alone. The omissions in the OIS Report and then delayed production of the most early evidence collected by the District itself in internal investigation interviews, that Akanbi, and possibly other DOC officers, were told directly by decedent of his suicidal intentions and, rather than take remedial steps, made statements encouraging suicide—in stark contrast to the findings and conclusion in the OIS Report—is troubling, to say the least. This apparent "hide-the-ball" discovery tactic is certainly relevant in assessing the District's challenge to the timing of the pending motion to amend the complaint. *See Atchinson*, 73 F.3d at 426 ("Consideration of whether delay is undue, however, should generally take into account the actions of other parties.").

Further, the approximately three-month gap between plaintiff obtaining the Harris Declaration on April 27, 2026, and filing the pending motion to amend on August 4, 2026, is not undue, especially when considered in the context of the District's discovery conduct, as other decisions have made amply clear. *See, e.g.*, *Atchinson*, 73 F.3d at 426; *Nat'l R.R. Passenger Corp. v. R & R Visual, Inc.*, No. 5-cv-822 (GK), 2007 WL 9760445, at *1 (D.D.C. Mar. 23, 2007) ("For whatever reasons, [defendant] never provided these reports [relevant to the proposed amended claims] in response to [plaintiff's] discovery requests. Thus, a two-and-a-half month . . . or even a four-and-a-half month delay . . . does not constitute undue delay of any kind, and certainly not sufficient undue delay to justify denial of the Motion to amend."). Moreover, plaintiffs are freely given leave to amend their complaints even years after the initial filing of the case, where plaintiffs provided sufficient grounds for the delay and no sufficient prejudice to defendants or others is shown. *See, e.g.*, *id.*; *Harrison v. Rubin*, 174 F.3d 249, 253 (D.C. Cir.

1999) (holding that leave to amend the complaint approximately two years after the original complaint was filed should have been granted where "no new factual allegations" and "[c]laims and defenses under the two statutes are virtually identical."); *Sinclair v. Kleindienst,* 645 F.2d 1080, 1085 (D.C. Cir. 1981) (holding leave to amend a complaint should have been granted more than five years after filing of the initial complaint, noting that plaintiffs' "substantial delay" was "insignificant relative to the five-year inability of the FBI to locate the same wiretaps" relevant to the claims); *cf. Brown v. FBI*, 744 F. Supp. 2d 120, 123 (D.D.C. 2010) (denying leave to amend complaint with additional claim, when plaintiff "provides no explanation for why he waited more than two years to try to amend his complaint," after other "claims were dismissed and summary judgment was entered against him"); *Klayman v. Jud. Watch, Inc.*, 288 F. Supp. 3d 314, 318 (D.D.C. 2018) ("To begin with undue delay, Plaintiff offers little explanation as to why he did not seek leave previously to add the [proposed] claim," even though "the events giving rise to the proposed amendment occurred long ago," but "because consideration of whether delay is undue should generally take into account the actions of other parties and the possibility of any resulting prejudice, the Court shall not dispose of the motion [to amend the complaint] based on this factor alone." (cleaned up) (citation omitted)).

Next, the District attempts to bolster its unjustifiable delay argument by taking aim at statements plaintiff made in support of her relation-back argument, which is described by the District as a "smokescreen to shield her unjustifiable delay." District's Opp'n at 8 (citing Pl.'s Mem. at 13 ("In light of the fact that . . . Akanbi worked in Love's cell block in June 2022 and responded to Love's death, it should have been apparent to Akanbi and his counsel that Plaintiff's Original Complaint intended to pursue claims against him . . . [so] Akanbi had constructive notice of the claims against him.")). Plaintiff, however, surfaced the relation-back

issue to forestall any potential statute of limitations challenge to adding Akanbi as a defendant. The District, meanwhile, does not contest plaintiff's assertions that her proposed claims against Akanbi relate back to plaintiff's original complaint, under Federal Rule of Civil Procedure 15(c), and that any statute of limitations applicable to her proposed claims against Akanbi should be equitably tolled. *See* Pl.'s Mem. at 10-14; *see generally* District's Opp'n. Instead, parroting its reliance on the Rule 26 Disclosure to show undue delay, the District points to this same disclosure to protest that plaintiff had constructive knowledge of Akanbi's identity and should have made the proposed amendment earlier. *See id.* at 8. As already discussed, however, plaintiff's failure to connect the dots, based on the Rule 26 Disclosure and/or the OIS Report, was not unreasonable under the circumstances.

In sum, plaintiff's explanation for her delay shows that the delay was not due to her lack of diligence or disinterest, given her sustained efforts to identify Akanbi from the start of this litigation and the mixed information made available in the District's serial productions, with the probative evidence on this issue held back from discovery for inexplicable reasons by the District for several years, from the initiation of this lawsuit until June 2026. Under these circumstances, the District's argument that plaintiff engaged in "unjustifiable" delay falls flat and provides no basis for denying plaintiff leave to amend.

**C. Prejudice**

Finally, "undue delay is not determined solely by the passage of time. Instead, when assessing whether delay is undue, courts look to both the reason for the delay, and the possibility of any resulting prejudice." *Greenspan v. Sec. Exch. Comm'n*, No. 22-cv-1153 (RCL), 2025 WL 901168, at *3 (D.D.C. Mar. 25, 2025) (citation omitted). Here, in addition to the passage of time, the District argues that the delay is undue because of prejudice to Akanbi as he "may have chosen to retain private counsel and/or handle discovery differently" and, at this point in the

litigation, "there is realistically no time for Corporal Akanbi to avail himself of these options due to [plaintiff's] delay." District's Opp'n at 9. The D.C. Circuit case on which the District primarily relies in support of this argument, *Atchinson v. District of Columbia*, makes clear, however, that the Court "d[id] not here hold that leave to amend to alter the capacity in which an official is sued may always be denied because of the mere possibility that the official would have retained separate counsel." 73 F.3d at 427. Instead, the D.C. Circuit in that case concluded that the district court did not abuse its discretion in denying leave to amend, based on a combination of factors, most notably that the plaintiff "did not move to amend until nearly two years after filing his complaint—on the eve of trial, when discovery was complete." *Id.* In those circumstances, allowing amended claims against a municipal employee in his personal capacity raised concern about "both the potential prejudice arising from joint representation and the limitations that the attorney-client privilege imposes on exploring such prejudice." *Id.* *Atchinson* is easily distinguished from the instant case, when, at the time the motion to amend was filed, discovery remained open for another five months, *see* Minute Order (June 5, 2026), no trial has been set and plaintiff has been attempting to name Akanbi as a defendant since the very start of this litigation, but the District has slow-walked the relevant discovery.

The District also argues in passing that "[c]ourts, faced with similar circumstances" to those in this case, "have denied leave to amend," citing two cases as support. District's Opp'n at 9-10 (citing *Am. Soc. for Prevention of Cruelty to Animals v. Ringling Bros. & Barnum & Bailey Circus* ("*ASPCA*"), 246 F.R.D. 39 (D.D.C. 2007) and *In re Papst Licensing GmbH & Co. KG Litig.*, 762 F. Supp. 2d 56 (D.D.C. 2011)). Yet, like *Atchinson*, both cases are distinguishable on their facts. In *ASPCA*, for example, plaintiff's motion to amend the complaint to add three former employees of defendant was denied, since the procedural posture of the case was that

dispositive motion briefing on partial summary judgment had already been resolved, resulting in narrowed issues, such that the proposed amendment "would significantly expand the scope of this case and require substantial additional discovery," in circumstances showing that the plaintiffs "could have filed th[e] motion more than seven months ago and have failed to provide a reason for waiting until this late date to do so." *ASCPA*, 246 F.R.D. at 44. In contrast, here, adding Akanbi as a defendant to the Section 1983, negligence, and wrongful death claims would not significantly expand the scope of the case or require substantial additional discovery, for which plenty of time remains. As plaintiff points out, "the District and Akanbi share counsel," all three proposed claims against Akanbi are based largely on facts that overlap with the claims underlying those she brings against the District, and plaintiff has already "sought" and obtained "discovery specific to Akanbi himself, because even before learning that Defendant 'Officer Akaie' is Akanbi, Plaintiff knew that Akanbi was on duty in [decedent's] cell block on the day of [decedent's] death, and that Akanbi responded to [decedent's] hanging." Pl.'s Mem. at 9-10. Plaintiff thus states she "does not anticipate seeking significant additional discovery related to her claims against Akanbi apart from what she has already sought from the District." *Id.* at 10. Plus, importantly, as reflected in the sequencing of discovery productions by the District, the dilatory nature of full discovery of information in the District's possession about the role allegedly played by Akanbi prior to and in connection with decedent's death is justification enough for the timing of the proposed amendment by plaintiff.

Likewise, *In re Papst* is no help to the District. In that case, a plaintiff patent assignee was found not to be "diligent in moving to amend the complaint" when plaintiff "knew about" a certain business move related to a patent "and mentioned [that] fact in a hearing before the Court," but "did not file its motion to amend until . . . more than a year later." 762 F. Supp. 2d at

59-60. The District stresses that the court relied on other patent cases in which three- and nine-month delays in seeking to amend a pleading was deemed to be too long. *See, e.g.*, District's Opp'n at 10 (noting that *In re Papst* cited to *Monolithic Power Sys., Inc. v. 02 Micro Int'l Ltd.*, No. 8-cv-4567 (CW), 2009 WL 3353306, at *2 (N.D. Cal. Oct. 16, 2009), for the conclusion "that [a party] was not diligent because it had the new information on the proposed accused products three months before it filed its motion to amend its infringement contentions"). These cases, which are not binding, fail to persuade because the *In re Papst* court relied not only on the timing of the requested amendment but the nature of the claims and litigation, explaining that, "With a lawsuit of great complexity, it is all the more imperative to avoid springing new claims on Defendants at a late stage." 762 F. Supp. 2d at 60 (citation omitted). Indeed, both *In re Papst* and *Monolithic Power* were patent cases. In contrast, here, plaintiff sought leave to file the proposed amendment only about two months after obtaining probative discovery from the District in June 2026, and the District makes no argument that any of the claims in this case are similarly as complex as the patent litigation was described in the cited cases.

Relatedly, the District points out that Akanbi may wish to retain private counsel or pursue a different discovery strategy, but any "resulting prejudice can be cured by allowing [Akanbi] an appropriate period to" retain such counsel, "respond to the amended pleading and by adjusting discovery deadlines accordingly." *Brown v. Am. Fed'n of State, Cnty. & Mun. Emps.*, No. 25-cv-4466 (CKK), 2026 WL 2099061, at *2 (D.D.C. July 21, 2026); *see also, e.g.*, *Rowe v. PChange, LLC*, No. 22-cv-3098 (JEB), 2024 WL 1655348, at *13 (D.D.C. Apr. 17, 2024) ("[A]ny prejudice can be mitigated by a limited reopening of fact discovery."); *Serv. Emps. Int'l Union Nat'l Indus. Pension Fund v. Aakash, Inc.*, No. 20-cv-0956 (CKK), 2025 WL 1158516, at *4

(D.D.C. Mar. 10, 2025) ("[T]he Court concludes that it would be equitable for the Court to grant a limited reopening of fact discovery if the Defendants requested that relief.").

Therefore, the District's argument for denying plaintiff's motion to amend, due to prejudice, fails as well.

## IV. CONCLUSION AND ORDER

For the foregoing reasons, the District has failed to meet its burden to show why plaintiff should be denied leave to amend her complaint. Accordingly, plaintiff's motion to amend the complaint is granted. An order consistent with this Memorandum Opinion will be filed contemporaneously.

Date: October 20, 2026

**BERYL A. HOWELL**
United States District Judge